| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY |
| FORMAN HOLT ELIADES & RAVIN LLC<br>80 Route 4 East, Suite 290<br>Paramus, NJ 07652<br>(201) 845-1000<br>Proposed Attorneys for Charles M. Forman,<br>Chapter 7 trustee<br>Harry M. Gutfleish (HG-6483) |

| In Re: | |
|---|---|
| THE RUSS COMPANIES, INC., et al.,[1]<br><br>                    Debtors. | Chapter 7<br>Case No. 11-22471 (DHS) |

**TRUSTEE'S APPLICATION FOR AN ORDER PURSUANT TO SECTIONS 105, 721, 363 and 364 AUTHORIZING TRUSTEE (A) TO OPERATE CERTAIN OF THE DEBTORS; (B) TO OBTAIN POST-PETITION FINANCING; (C) TO RETAIN CERTAIN OF THE DEBTOR'S EMPLOYEES; (D) TO PAY PRE-PETITION EMPLOYEE SALARY, WAGE, EXPENSE REIMBURSEMENT AND OTHER EMPLOYEE OBLIGATIONS; (E) TO CONTINUE THE DEBTORS' CASH MANAGEMENT SYSTEM AND (F) GRANTING RELATED RELIEF**

Charles M. Forman, the chapter 7 trustee (the "Trustee") for The Russ Companies, Inc. ("TRC"), Russ Berrie Company Investments, Inc. ("Russ Investments"), Russ Berrie U.S. Gift Inc. ("Russ Gift"), The Encore Group, Inc. ("Encore Group"), Russ Berrie and Company Properties, Inc. ("Properties"), and Russplus, Inc. ("Russplus" and, together with TRC, Russ Investments, Russ Gift, Encore Group, and Properties, the "Debtors"), through his attorneys, Forman Holt Eliades & Ravin LLC, submits this application for an Order or Orders authorizing the Trustee (a) to operate certain of the Debtors, (b) to obtain post-petition financing, (c) to retain certain of the Debtors' employees, (d) to pay pre-petition employee salary, wage, expense reimbursement and other employee obligations, (e) to continue the Debtors' cash management

---

[1] The Debtors are The Russ Companies, Inc., Russ Berrie Company Investments, Inc., Russ Berrie U.S. Gift Inc., The Encore Group, Inc., Russ Berrie and Company Properties, Inc., and Russplus, Inc.

system and (f) granting related relief.  In support, the Trustee respectfully represents that:

**A.   Jurisdiction and Venue**

1. This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. § 1334.

2. This is matter is a core proceeding as that term is used in 28 U.S.C. § 157(b).

3. Venue of this contested matter is proper in this District under 28 U.S.C. §§ 1408 and 1409.

**B.   The Debtors**

4. On April 21, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code").

5. Also on April 21, 2011, the Office of the United States Trustee appointed the Trustee to serve as the chapter 7 trustee for each of the Debtors' estates.

6. On or about December 23, 2008, the Encore Group, Inc. acquired substantially all of the tangible and intangible assets related to the global gift division of Russ Berrie and Company, Inc., a non-debtor entity (the "Russ Berrie") and changed its corporate name to TRC.

7. TRC (and its U.S. and foreign subsidiaries) was engaged in the design and marketing of gifts and collectibles, plush, home décor and specialty gift products around the world, primarily under the Russ and Applause trademarks, to retail stores world-wide ("Gift Business").[2]

8. In connection with TRC's acquisition of the Gift Business, Russ Berrie changed its corporate name to to Kid Brands, Inc. ("Kid") and transferred certain intellectual property

---

[2] The foreign subsidiaries are:  (a) Amram's Distributing, Ltd.; (b) Russ Australia Pty Limited CAN 088 221 881; (c) Russ Berrie (Ireland) Limited; (d) Russ Berrie (U.K.) Limited; (e) Tri Rus International (Hong Kong) Limited ('Tri Russ"); (f) Russ Berrie Espana, S.L; and (g) Russ Consulting Service (Shenzen) Co., Ltd.

2

related to the Gift Business (including the right to use the name, "Russ Berrie") to a wholly owned limited liability company, RB Trademark Holdco, LLC ("Holdco"). Holdco licensed the intellectual property to TRC on an exclusive basis. The license provided TRC with the option to purchase the intellectual property, in part, by satisfying the outstanding balance on a subordinated promissory note in the original principal amount of $19 million executed by TRC and delivered to Kid in connection with the purchase of the Gift Business (the "Kid Note").

9.  As of the Petition Date, TRC was the sole shareholder of Russ Investments, Russ Gift, Properties and Russplus and Russ Gift was was the sole shareholder of Encore. TRC, Russ Gift and Russ Investments are the ultimate corporate parents of subsidiary entities conducting business in Canada, Hong Kong, China, the United Kingdom, Ireland, Spain and Australia.

C.  **Events Leading To The Bankruptcy Filings**

10. For a number of reasons, including but not limited to events surrounding TRC's acquisition of the Gift Business, the Debtors suffered a reduction of expected cash flow from the Gift Business leading to significant economic hardship.

11. The reduction in expected cash flow deprived the Debtors of cash for operations and prevented the timely payment in full of Gift Business obligations to overseas vendors. As a result, many of those vendors refused to extend lines of credit and ship inventory at various times. Orders by Gift Business customers were lost or cancelled, further tightening the Gift Business' cash flow. The reduction in cash flow also prevented the Debtors from fully utilizing their line of credit with their pre-petition lender, Wells Fargo, National Association ("Wells Fargo"). The Debtors' cash flow problems made it difficult for them to obtain inventory and, therefore, to consistently generate sufficient sales revenues.

12. In November, 2010, at Wells Fargo's direction, the Debtors hired Clear Thinking Group to assist in the restructuring of the Gift Business.

13. On February 7, 2011, Stuart Kessler of Clear Thinking Group was appointed the Debtors' Chief Restructuring Officer.

14. Between December , 2010 and the Petition Date, in collaboration with the Debtors and the Debtors' investment banker, Mr. Kessler and Clear Thinking Group contacted numerous parties in an attempt to refinance the Debtor's secured debt, raise new capital, or restructure the Gift Business, or sell the Gift Business or one or more of the Debtors. Unfortunately, those attempts were not successful.

15. Following Mr. Kessler's appointment, the Debtors also negotiated COD terms with overseas vendors. Although initially resistant, many of the overseas vendors came to accept those terms. However, the COD terms did not permit the Debtors to purchase increased amounts of inventory.

16. The Debtors' shrinking collateral base (which resulted largely from cash flow problems) led the Debtors to default under their pre-petition credit facility with Wells Fargo (as amended, the "Credit Agreement"). Notwithstanding the Debtors' financial problems, Wells Fargo entered into numerous forbearance agreements with the Debtors, the most recent being a Seventh Amendment to Forbearance Agreement dated March 29, 2011 ("Seventh Amendment").

17. On April 14, 2011, Wells Fargo issued a notice of default under the Seventh Amendment, advised of its intent to review its rights and remedies as a result of the default, and reserved all of its rights and remedies

18. On April 15, 2011, Holdco and Kid issued a notice of default under the license agreement for use of the name, "Russ Berrie," for failure to pay royalties.[3] In the notice, Holdco and Kid advised the Debtors that they were "currently evaluating the consequences" of the alleged defaults and reserving their rights and remedies under the various agreements with the Debtors and under applicable law. To date, the license has not been terminated.

19. Given the precarious state of affairs, and to protect their assets, business and interests, the Debtors commenced these chapter 7 cases.

**D.    The Debtors' Assets and Debt Structure**

20. As of the Petition Date, the Debtors owed approximately $13 million to Wells Fargo. Upon information and belief, Wells Fargo holds a first priority lien on substantially all of the Debtors' assets, including pledges of 65% of the stock interests in the Debtors' foreign subsidiaries.

21. The Credit Agreement was made to the Debtors and to Amrams's Distribution, Ltd., a Canadian subsidiary of Russ Investments. Upon information and belief, Wells Fargo also holds a first priority lien on substantially all of that Canadian entity's assets.

22. As of the Petition Date, the Debtors (except for Encore) owed or guaranteed principal of $19 million under the Kid Note. Upon information and belief, Kid asserts a lien on substantially all of the Debtor's assets except Encore, which lien is junior to the liens held by Wells Fargo.[4]

---

[3] The Trustee has been informed that Kid owes a debt to the Debtors of approximately $1.2 million.

[4] The Trustee believes that the Debtors' estates may hold significant claims against Kid and defenses to this obligation.

23.    As of the Petition Date, the Debtors' books and records reflect a debt due to Eldrige Hanes of $500,000 which is *pari passu* with Kid's alleged debt. Upon information and belief, Mr. Hanes also asserts an interest in the collateral pledges to Kid.[5]

24.    As of the Petition Date, the Debtors had inventory valued at approximately $10.5 million and accounts receivable of approximately $10 million, in addition to their respective ownership interest if the foreign subsidiaries.

25.    In addition, the Canadian subsidiaries had inventory valued at approximately $4.5 million and accounts receivable of approximately $2.5 million.

### E.    Summary of the Relief Requested

26.    After consulting with the Debtors, Clear Thinking Group and Wells Fargo, the Trustee believes that the best way to maximize the value of the Debtors' assets is to preserve the Debtors as going concerns in the near future, to continue to sell inventory in the ordinary course of business, and to develop a framework to sell the Debtors or their assets as quickly as possible.

27.    At the same time, the Trustee is cooperating in the liquidation of the assets of the foreign subsidiaries to maximize the possibility of generating a recovery for the Debtors' creditors from a liquidation of those entities' assets.

28.    In order to do so, however, the Trustee requires the financing necessary to achieve these goals, authority to retain and continue to compensate certain of the Debtors' employees, and authority to maintain the Debtors' cash management system.

29.    In addition, since many of the Debtor's employees were let go with little or no notice, the Trustee seeks authority to pay outstanding pre-petition wages to those employees and to the employees to be retained.

---

[5] The Trustee believes that the Debtors' estate may hold defenses to this obligation.

30. The Trustee respectfully submits that the relief requested is designed to avoid the piecemeal liquidation of the Debtors' assets and to maximize the potential recovery for creditors, and is fair and equitable.

**F.    Operation of the Debtors**

31. Section 721 of the Bankruptcy Code provides that the Court "may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." *See also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985).

32. Section 721 of the Bankruptcy Code contemplates circumstances were preserving assets pending a future sale my result in an increase benefit to the estate as opposed to an immediate cessation of operations and piecemeal liquidation. *See, e.g., In re A&T Trailer, Inc.*, 144, 147 (Bankr. D. Wyo. 1985) ("in a limited number of situations, such as where it appears that a business could be sold for a greater price as a going concern than would be obtained in ordinary liquidation"); *In re Quarter Moon Livestock Co.*, 116 B.R. 775,782 (Bankr. D. Idaho 1990) (authorizing trustee to operate debtor's cattle business "to wait until fall to roundup and sell the cattle herd and to maintain the livestock until that time").

33. As part of these operations, the Trustee proposes to pay certain post-petition expenses, including occupancy costs for the Debtors' main office in Wayne, New Jersey and its distribution center in Cranbury, New Jersey, as well as insurance, employee compensation, and other costs identified on the budget to be attached to be submitted (the "Budget").

34. The Trustee submits that the continued operation of the Debtors' business on a limited basis and for a limited period of time is in the best interests of the Debtors' estates and is consistent with the orderly liquidation of the Debtors' estates. Further, as explained throughout,

the Trustee believes that operating the Debtors on a limited basis for a limited period of time is designed to maximize the value of the Debtors' assets for all interested parties.

35. Wells Fargo concurs and has agreed to provide post-petition financing to the Trustee for a short period of time, subject to the terms and conditions set forth, since the Debtors' cash flow simply will not enable to Trustee to meet the Debtors' operating expenses

F.     **Necessity For Post-Petition Financing**

36. The Trustee seeks authorization to obtain post-petition financing from Wells Fargo under section 364 of the Bankruptcy Code to operate the Debtors' and to orderly liquidate the Debtors' assets.

37. The Trustee and Wells Fargo have negotiated the terms of the proposed financing, which are memorialized in the proposed Interim Order filed herewith (or to be filed). Pertinent terms include, but are not limited to the following:

   A. The Trustee will be authorized to borrow funds up to a maximum amount solely to fund the expenditures set forth in the Budget.

   B. Wells Fargo will receive replacement liens and priming liens on their current collateral and the proceeds thereof. **However Wells Fargo will not have a lien on, or security interest in any avoidance actions or recoveries under chapter 5 of the Bankruptcy Code.**

   C. Wells Fargo will be granted an allowed superpriority administrative expense claim subject only to certain carve-outs.

   D. Wells Fargo will be given relief from the automatic stay and authorization to exercise its rights to its collateral (and all other remedies) on limited notice to the Trustee.

   E. The Trustee's professionals will be entitled to carve-outs for their fees and expenses set forth in the Budget.

   F. Wells Fargo will be entitled to the protections of Section 364(e) of the Bankruptcy Code.

8

38. The Budget includes expenses necessary for the orderly liquidation of the Debtors' including, without limitation, (a) payroll for the skeleton staff that the Trustee will need to retain for the orderly liquidation of the Debtors' assets, (b) rent for the Debtors' main office and distribution center, (c) professional fees, (d) equipment leases, primarily in connection with IT equipment (including its return to the lessor as it becomes unnecessary, (e) shipping and freight charges to ship goods subject to pending orders, (f) services and supplies, including security, and (g) telecom and IT.

39. The Trustee need only demonstrate "a good faith effort that credit was not available without" the protections of Sections 364(c) and 364(d) of the Bankruptcy Code. *See, e.g., In re Snowshoe Co.*, 789 F.2d at 1088. When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, as in this case, "it would be unrealistic and unnecessary to require [debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *accord Bray v. Shenandoah Fed. Sav. & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (the "statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re 495 Cent. Park Ave., Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (same).

40. Given the exigencies of this case, and the Debtors' debt structure, the Trustee does not believe that alternative financing would be available from any source other than Wells Fargo or on better terms.

41. Thus, the Trustee submits that the proposed post-petition financing provides the only feasible mechanism for the Debtors' estates to secure the financing necessary to liquidate the Debtors' assets and maximize the potential recovery to creditors.

42. Upon information and belief, Mr. Hanes consents to the relief sought.

43. In accordance with a pre-petition Intercreditor Agreement executed by Wells Fargo and Kid, in the event that the Debtors were to file for relief under the Bankruptcy Code, Kid agreed not to object Wells Fargo providing post-petition financing to the Debtors, not to demand adequate protection (or argue that its interests were not adequately protected). Therefore, Kid has no legal basis to object to the relief sought.

44. Accordingly, the Trustee requests that this Court enter the Interim Order.

### G. The Payment of Pre-Petition Wages, Salaries and Expense Checks

45. On April 15, 2011, the Debtors issued paychecks to the remaining approximately 80% of their employees. For some of those employees, the April 15, 2011 payroll covered work performed through and including April 13, 2011. For the remainder, the payroll covered work performed through and including April 8, 2011.

46. On April 21, 2011, the Debtors issued paychecks to approximately 20% of their employees. That payroll covered work performed up to and included April 15, 2011.

47. On April 21, 2011, and without notice, the Debtors were forced to lay-off their 247 employees.

48. In order to effectively operate the Debtors, the Trustee anticipates that he will retain only 47 of the Debtors' former 247 employees.

49. Prior to the Petition Date, and in the ordinary course of the Debtors' businesses, the Debtors' employees were owed or had accrued various sums for wages, salaries and expenses. In addition, some of the Debtors' employees were entitled to reimbursement of expenses incurred in connection with the operations of the Debtors' business. As of the Petition

Date, the Debtors' employees had incurred approximately $50,000 in expenses on behalf of the Debtors.

50.  Therefore, out of fairness and consistent with equitable principles, the Trustee seeks authority to pay accrued employee wages, salaries, and expenses to all of the Debtors' former employees.  Those payments will not exceed $351,000.

51.  Wells Fargo consents to these payments to be paid from from the post-petition financing provided by Wells Fargo and are included in the Budget.

52.   To the best of the Trustee's knowledge, none of the payments to an employee will exceed the $11,725 cap for priority status and treatment under section 507(a)(4) of the Bankruptcy Code.

53.  Given the exigencies and timing of the Debtors' abrupt cessation of operations, the Trustee's payment of pre-petition wages to the employees that he will retain is authorized under the equitable powers of section 105(a) of the Bankruptcy Code. *See, e.g.*, *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3rd Cir. 1981) (the "necessity of payment" doctrine "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized…"); *see also Pension Benefit Guarantee Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 736-37 (Bankr.W.D.Pa. 1993); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr.S.D.N.Y. 1989); *In re R.H. Macy & Co., Inc.*, 92 B 40477 (Bankr. S.D.N.Y. 1992); *In re McCrory Corporation*, 92 B 41133 (Bankr. S.D.N.Y. 1992).

54.  In addition, the Trustee submits that this this Court should exercise its broad equitable powers under section 105(a) of the Bankruptcy Code to authorize the Trustee to pay

11

the pre-petition wages and related obligations to those employees were laid-off without notice and who will not be employed going forward.

### H. The Pre-Petition Cash Management System

55. In accordance with the Debtor's pre-petition loan facility with Wells Fargo, all of the Debtors' accounts receivable were directed to a lock-box controlled by Wells Fargo and then deposited into a cash collateral account. On a daily basis, Wells Fargo would sweep the funds on deposit in the cash collateral account to repay the Debtors' obligations. The Debtors would then be entitled to borrow funds from Wells Fargo in accordance with the formulas, terms and conditions set forth in the loan documents.

56. In order to not interrupt (and possibly adversely affect collection the accounts receivable), Wells Fargo has requested , and the Trustee proposes, to leave this cash management system in place, except that the Trustee would have access to the post-petition financing on the terms and conditions set forth in the Interim Order.

57. Wells Fargo has agreed to open a new account in the Trustee's name as part of the cash management system.

58. Wells Fargo will provide access to the Trustee to monitor the daily flow of funds into the cash collateral account and the application of those funds to the obligations owed to Wells Fargo.

59. The Trustee submits that authorization to maintain this cash management system is vital to his ability to operate the Debtors efficiently and to protect the significant value of the Debtors' accounts receivable (which will be used to reduced the secured obligations owed to Wells Fargo).

**I.**     Notice

60.    The Trustee will provide notice of this motion to (a) the Office of the United States Trustee, (b) Wells Fargo, (c) Kid, and (d) Mr. Hanes. Under the circumstances, the Trustee submits that the notice provided s reasonable.

**J.**     **Waiver Of 14-Day Stay Period**

61.    In light of the exigencies of these cases, the Trustee requests that the Court waive the 14-day stay period under Bankruptcy Rule 6004(h).

**K.**     **Conclusion**

WHEREFORE, the Trustee respectfully requests that the Court enter the Interim Order and an Order authorizing the Trustee to (a) operate certain of the Debtors, (b) to retain certain of the Debtors' employees, (c)  to pay pre-petition employee salary, wage, expense reimbursement and other employee obligations, (d) to continue the Debtors' cash management system and (e) granting related relief.

> FORMAN HOLT ELIADES & RAVIN LLC
> Proposed Attorneys for Charles M. Forman,
> Chapter 7 Trustee
>
>
> By:___*/s/ Harry M. Gutfleish*_____
>      Harry M. Gutfleish

Dated:  April 21, 2011

13