UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

FORMAN HOLT ELIADES & RAVIN LLC
80 Route 4 East, Suite 290
Paramus, NJ 07652
(201) 845-1000
Attorneys for Charles M. Forman,
Chapter 7 trustee
Harry M. Gutfleish (HG-6483)
Kim R. Lynch (KL-5866)

In Re:

THE RUSS COMPANIES, INC., et al.,[1]

               Debtors.

Chapter 7
Case No. 11-22471 (DHS)
(Jointly Administered)

Hearing Date:
Hearing Time:

**TRUSTEE'S MOTION FOR THE ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES, SCHEDULING BID DEADLINE, AUCTION SALE AND HEARING TO APPROVE SALE, (B) APPROVING SETTLEMENT WITH SECURED LENDERS, (C) AUTHORIZING THE TRUSTEE TO SELL THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (D) AUTHORIZING THE TRUSTEE TO EXERCISE CONTROL OVER FOREIGN SUBSIDIARIES, (E) GRANTING THE TRUSTEE AN EXTENSION OF TIME TO REJECT, ASSUME, OR ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (F) AUTHORIZING THE TRUSTEE TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (G) AUTHORIZING THE TRUSTEE TO REJECT CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (H) AUTHORIZING THE TRUSTEE TO ABANDON CERTAIN ASSETS AND (I) GRANTING RELATED RELIEF**

TO THE HONORABLE DONALD H. STECKROTH, U.S.B.J.:

      Charles M. Forman, the chapter 7 trustee (the "Trustee") for The Russ Companies, Inc.

("Russ Companies"), Russ Berrie Company Investments, Inc. ("Investments"), Russ Berrie U.S.

Gift, Inc. ("Russ Berrie Gift"), The Encore Group, Inc. ("Encore"), Russ Berrie and Company

---

[1] The Debtors are The Russ Companies, Inc., Russ Berrie Company Investments, Inc., Russ Berrie U.S. Gift, Inc., The Encore Group, Inc., Russ Berrie and Company Properties, Inc., and Russplus, Inc.

Properties, Inc. ("Russ Properties"), and Russplus, Inc. ("Russplus") (collectively, the "Debtors"), through his attorneys, Forman Holt Eliades & Ravin LLC, submits this application pursuant to sections 105(a), 363(b), (f) and (m), 365(a) and 554 of Title 11, United States Code (the "Bankruptcy Code") and Rules 6004, 6006, 6007 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Rules"), for the entry of an Order (a) approving bidding procedures, scheduling bid deadline, auction sale and hearing to approve sale, (b) approving settlement with secured lenders, (c) authorizing the Trustee to sell the Debtors' assets free and clear of liens, claims, interests and encumbrances, (d) authorizing the Trustee to exercise control over foreign subsidiaries, (e) granting the Trustee an extension of time to reject, assume, or assume and assign executory contracts and unexpired leases, (f) authorizing the Trustee to assume and assign certain executory contracts and unexpired leases, (g) authorizing the Trustee to reject certain executory contracts and unexpired leases, (h) authorizing the Trustee to abandon certain assets, and (i) granting related relief (the "Motion").  In support, the Trustee respectfully represents that:

A.    **Background**

1.    On April 21, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code").

2.    On April 21, 2011, the Office of the United States Trustee appointed the Trustee to serve as the chapter 7 trustee for each of the Debtors' estates.

3.    On April 26, 2011, the Court entered an Order directing the joint administration of the Debtors' estates.

B.    **The Debtors**

4.    On or about December 23, 2008, Encore acquired substantially all of the tangible

and intangible assets related to the global gift division of Russ Berrie and Company, Inc., a non-debtor entity ("Russ Berrie") and changed its corporate name to Russ Companies.

5.      Russ Companies and its U.S. and foreign subsidiaries were engaged in the design and marketing of gifts and collectibles, plush, home décor and specialty gift products around the world, primarily under the RUSS and APPLAUSE trademarks, to retail stores world-wide ("Gift Business").

6.      In connection with Russ Companies' acquisition of the Gift Business, Russ Berrie changed its corporate name to Kid Brands, Inc. ("Kid") and retained certain intellectual property related to the Gift Business through a wholly owned limited liability company, RB Trademark Holdco, LLC ("Holdco").  Holdco licensed the intellectual property to Russ Companies on an exclusive basis.  The license provided Russ Companies with the option to purchase the intellectual property, in part, by satisfying the outstanding balance due under the Kid Note (defined below) and $5 million in cash.

**C.      Events Leading To The Bankruptcy Filings**

7.      For a number of reasons, the Debtors suffered a reduction of expected cash flow from the Gift Business leading to significant economic hardship.

8.      The reduction in expected cash flow deprived the Debtors of cash for operations and prevented the timely payment in full of Gift Business obligations to overseas vendors.  As a result, many of those vendors refused to extend lines of credit and ship inventory at various times.  Orders by Gift Business customers were lost or cancelled, further tightening the Gift Business' cash flow.  The reduction in cash flow also prevented the Debtors from fully utilizing their line of credit with their pre-petition lender, Wells Fargo Bank, National Association

3

("Wells Fargo").  The Debtors' cash flow problems made it difficult for them to obtain inventory and, therefore, to consistently generate sufficient sales revenues.

9.      In November, 2010, at Wells Fargo's suggestion, the Debtors hired Clear Thinking Group to assist in the restructuring of the Gift Business.

10.     On February 7, 2011, Stuart Kessler of Clear Thinking Group was appointed the Debtors' Chief Restructuring Officer.

11.     Between December , 2010 and the Petition Date, in collaboration with the Debtors and the Debtors' investment banker, Mr. Kessler and Clear Thinking Group contacted numerous parties in an attempt to refinance the Debtors' secured debt, raise new capital, restructure the Gift Business, sell the Gift Business, or sell one or more of the Debtors and the non-debtor subsidiaries.  Unfortunately, those attempts were not successful.

12.     Following Mr. Kessler's appointment, the Debtors also negotiated COD terms with overseas vendors.  Although initially resistant, many of the overseas vendors came to accept those terms.  However, the COD terms did not permit the Debtors to purchase increased amounts of inventory.

13.     The Debtors' shrinking collateral base (which resulted largely from cash flow problems) led the Debtors to default under their pre-petition credit facility with Wells Fargo (as amended, the "Credit Agreement").  Notwithstanding the Debtors' financial problems, Wells Fargo entered into numerous forbearance agreements with the Debtors, the most recent being a Seventh Amendment to Forbearance Agreement dated March 29, 2011 ("Seventh Amendment").

14.     On April 14, 2011, Wells Fargo issued a notice of default under the Seventh Amendment, advised of its intent to review its rights and remedies as a result of the default, and reserved all of its rights and remedies.

15.     On April 15, 2011, Holdco and Kid issued a notice of default under the license agreement for use of the name, "Russ Berrie," for failure to pay royalties.  In the notice, Holdco and Kid advised the Debtors that they were "currently evaluating the consequences" of the alleged defaults and reserving their rights and remedies under the various agreements with the Debtors and under applicable law.  To date, the license has not been terminated.

16.     Given the precarious state of affairs, and to protect their assets, businesses and interests, the Debtors commenced these chapter 7 cases.

**D.    The Debtors' Corporate Structure**

17.     Russ Companies is the owner and sole shareholder of Investments, Russ Berrie Gift, Encore, Russ Properties and Russplus.

18.     Russ Companies also owns, and is the sole shareholder of Russ Berrie (U.K.) Limited ("Russ UK"), Russ Australia Pty Ltd ("Russ Australia"), Russ Berrie (Ireland) Limited ("Russ Ireland"), Tri Russ International (Hong Kong) Limited ("Tri Russ").

19.     Investments owns and is the sole shareholder of Amram's Distributing, Ltd. ("Russ Canada").  Russ Canada was placed in receivership in Canada and the Russ Canada Assets (as hereinafter defined) are being liquidated by Ken Pearl of BDO Canada Limited, a receiver appointed by the Canadian Courts (the "Receiver").

20.     Russ UK owns and is the sole shareholder of Russ Berrie Espana, S.L. ("Russ Spain").

21.     Tri Russ owns and is the sole shareholder of Russ Consulting Service (Shenzhen) Co., Ltd. ("Russ China").

22.     Russ Ireland terminated its operations prior to the Petition Date.

23.      Tri Russ and Russ China are currently winding down their respective business operations.

24.      The Trustee will not be offering for sale, and specifically excludes, the Debtors' interests in Russ Ireland, Tri Russ or Russ China, or any of their respective assets, from his proposed sale, except that Russ Spain may be sold as as an asset of Russ UK.

## E.      The Debtors' Debt Structure

25.      Pursuant to that certain Credit and Security Agreement, dated as of December 23, 2008 (as amended, modified, supplemented or restated from time to time, the "Credit Agreement"), by and among each of the Debtors as borrowers, Richard D. Snow and Russ Canada, as guarantors, and Wells Fargo, acting through its operating division Wells Fargo Capital Finance, as lender, Wells Fargo agreed to provide the Debtors with a revolving line of credit for working capital purposes and to facilitate the issuance of documentary and standby letters of credit, in the maximum aggregate principal amount of $25,000,000.  To induce Wells Fargo to extend credit to the Debtors under the Credit Agreement, the Debtors granted to Wells Fargo a lien and security interest in substantially all of their respective assets and pledged to Wells Fargo 65% of the the equity interests in the Debtors' foreign subsidiaries.  The remaining 35% of the equity interest in the Debtors' foreign subsidiaries is not encumbered.

26.      As of the Petition Date, the Debtors owed approximately $13 million to Wells Fargo.

27.      In connection with its acquisition of the Gift Business, Russ Companies issued a secured promissory note dated December 23, 2008 in favor of Kid in the original principal amount of $19,000,000 (the "Kid Note").  Each of the other Debtors (except Encore) guaranteed Russ Companies' obligations to Kid.  In connection with this transaction, and pursuant to a

Subordinated Security Agreement, dated as of December 23, 2008, the Debtors (other than Encore) granted security interests to Kid in the collateral pledged to Wells Fargo. Pursuant to that Security Agreement and an intercreditor agreement between Wells Fargo and Kid dated as of December 23, 2008, Kid's security agreement, Kid's security interests in the collateral pledged are subordinated to Wells Fargo's interests therein.

28.     Pursuant to that certain Amended and Restated Subordinated Promissory Note dated December 23, 2008 (the "Hanes Note"), Eldridge C. Hanes ("Hanes"), the Encore Group, Inc., now Russ Companies delivered to Hanes a promissory note in the original principal amount of $500,000.  Pursuant to a Subordinated Security Agreement dated as of December 23, 2008, the Debtors granted security interests to Hanes in the collateral pledged to Wells Fargo and Kid. Pursuant to that Security Agreement and a Subordination Agreement dated as of December 23, 2008 between Wells Fargo and Hanes, Hanes's interests in the collateral pledged are subordinated to Wells Fargo's interests therein.  Pursuant to an intercreditor agreement between Hanes and Kid dated December 23, 2008, Hanes and Kid agreed, among other things, that their liens were secured on an equal, ratable and *pari passu* basis to the extent of the Debtors' respective obligations under the Kid Note and the Hanes Note.

F.     **The Trustee's Post-petition Operations and Financing**

29.     On April 21, 2011, the Trustee filed a motion for an Order authorizing him (a) to operate certain of the Debtors, (b) to obtain post-petition financing, (c) to retain certain of the Debtors' employees, (d) to pay pre-petition employee salary, wage, expense reimbursement and other employee obligations, (e) to continue the Debtors' cash management system and (f) granting related relief.

30.     On April 21, 2011, the Court entered an Order granting in the Trustee's motion to operate the Debtors.

31.     On April 25, 2011, the Court entered an Interim Order authorizing the Trustee to obtain post-petition financing from Wells Fargo and to use cash collateral pledged to Wells Fargo, Kid and Hanes (the "Cash Collateral") to operate the Debtors in accordance with the 3-week budget attached thereto.

32.     On May 12, 2011, this Court entered a Final Order (the "Final Financing Order") authorizing the Trustee to obtain financing from Wells Fargo and to use the Cash Collateral to operate the Debtors in accordance with the budget attached thereto (the "Budget").  Among other things, the Final Financing Order provided a carve-out from the collateral pledged to Wells Fargo, Kid and Hanes (the "Collateral") for the benefit of the Debtors' estates (the "Carve Out") for (a) the fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a), (b) fees and expenses of the Trustee's professionals in the aggregate amount of $600,000, which amount shall be deposited into a segregated account in 3 consecutive monthly payments of $200,000 commencing May 25, 2011 and allocated among the Trustee's professionals, provided that such fees and expenses are subject to Bankruptcy Court approval, less any amounts previously paid in accordance with the Budget, and (c) an estimated amount for commissions payable to the Trustee to be funded on a weekly basis and deposited into a separate account, which amount is to be calculated in accordance with section 326 of the Bankruptcy Code, is subject to Bankruptcy Court approval, and is less any amounts previously paid in accordance with the Budget.

**G.**     **The Settlement**

33.     The Trustee, Wells Fargo, Kid and Hanes have engaged in protracted, good faith

negotiations regarding, among other things, (a) the Trustee's continued operation of the Debtors, (b) the Trustee's proposed sale of the Debtors' assets and the maximization of value for the foreign subsidiaries, (c) the treatment (and protection) of the secured claims asserted, and (d) establishing a fund for the benefit of other creditors of the Debtors' estates.

34.   Under the parties' settlement (the "Settlement"), the Trustee seeks to sell the Debtors and the Non-Debtor Entities (as hereinafter defined) in the following alternative structures: (a) as a global going concern, which would include inventory, contract rights and intellectual property and the Debtors' equity interests in Russ Australia and Russ UK (and which may include the intellectual property owned by Holdco (the "Kid IP"); (b) as independent going concern entities with or without the Kid IP; (c) sales of the Debtor Assets (as hereinafter defined) under the Bankruptcy Code in conjunction with Russ UK Assets and Russ Australia Assets (as each are hereinafter defined); or (d) any combination of the foregoing. As proposed, the Trustee will offer the US Accounts Receivable (as hereinafter defined) for sale, subject to the consent of Wells Fargo, as described in paragraph 41.

35.   In these sales, and subject to the terms and conditions set forth herein, Wells Fargo, Kid and Hanes will agree to permit the sales of all of the assets (domestic or foreign) free and clear of their liens, which liens will be paid or treated in accordance with the Waterfall (as defined below).

36.   Wells Fargo, Kid and Hanes have agreed that none will assert an interest in avoidance actions under chapter 5 of the Bankruptcy Code that are held by the Debtors' estates or the proceeds therefrom, except as general unsecured creditors to the extent of their respective deficiency claims, if any.

37.     In connection with a global, going concern sale, the Trustee may offer for sale the Kid IP, provided that Kid receives not less than $6 million from the sale (or such lesser amount as Kid in its sole and non reviewable discretion may determine to accept).  The Trustee will not seek to assume and assign the Holdco License Agreement.  In this scenario, and whether or not the Kid IP is sold, the parties have agreed that the proceeds of liquidation of the Collateral will be distributed as follows (the "Waterfall"):

(a)     The total sum then due and owing to Wells Fargo (the "Wells Fargo Obligation"), which is projected to be approximately $11.1 million, exclusive of the amount of the Carve-Out that has not been funded by Wells Fargo under the Final Financing Order as of the closing; then

(b)     to the Debtors' estates to fund the Carve-Out, which shall be expanded to include $150,000 for payment to Kid and $20,000 for payment to Hanes, on account of their respective legal fees and costs, and which Carve-out shall extend to all collateral pledged to Wells Fargo, Kid and Hanes; then

(c)     $1 million to Kid less $26,000, which the Trustee shall pay to Hanes; then

(d)     $974,000 to the Debtors' estates for distribution in accordance with the priority scheme set forth under the Bankruptcy Code and $26,000 to Hanes.

(e)     The balance of the proceeds of sale of the Collateral recovered by the Trustee from the liquidation of the Debtors Assets, less all amounts subject to the Carve-Out and exclusive of avoidance actions recoveries shall constitute the "Remaining Sale Proceeds."  Subject to subparagraph (f), the Trustee shall distribute sixty percent (60%) of the Remaining Sale Proceeds to Kid on account

of its Allowed Secured Claim specified in paragraph 42(b) hereof (the "Kid Allocation") and shall distribute forty percent (40%) of the Remaining Sale Proceeds to the Debtors' estates (such 40% share of the Remaining Sale Proceeds the "Estate Sale Proceeds").

(f)     Hanes shall be entitled to receive 2.6 percent of the Remaining Sale Proceeds.  The Trustee shall deduct 2.6 percent of the amounts payable to Kid under paragraph 37(e) and shall pay the deducted amount(s) to Hanes.  In addition, the Trustee shall pay to Hanes 2.6 percent of the Estate Sale Proceeds.

(g)     Proceeds derived from the sale of any asset that is not a component of the Collateral, shall be distributed directly to the Debtors' estates and not through the Waterfall.

(h)     Except as provided above, Kid and Hanes waive their respective liens on or any right to Estate Sale Proceeds other than as general unsecured creditors to the extent of their respective deficiency claims, if any.

38.     The parties will set an upset price for the global sale which, if it includes the Kid IP, is estimated to be $20 million, subject to adjustment based on the amounts due to Wells Fargo at the time of the sale.

39.     A successful party bidding for the global, going concern operations will stand in the shoes of the Trustee vis-à-vis those assets and, at the bidder's discretion, may abandon or select not to take certain assets. If the bidder chooses not to take certain of the assets, the Trustee may liquidate those assets in accordance with the Sale Process (as hereinafter defined) or otherwise in the exercise of his business judgment.

40.     If the Trustee sells the Debtors' assets (or those of the Non-Debtor Entities) in a manner other than as a global, going concern, the Carve-Out will be augmented by the following items and in the following amounts:  (a) for the actual costs for professional fees and expenses associated with the wind-down of the China, Hong Kong and Korea operations (approximately $175,000); (a) for the disposition of the Debtors' books and records (approximately $15,000); (c) for the retention of appraisers (approximately $10,000); and (d) for additional professional fees and expenses incurred by the Trustee up to a maximum of an additional $200,000.  Further, the proceeds of such sales will be distributed in accordance with the Waterfall, except that the Debtors' estate will not be entitled to the payment required under paragraph 37(d) above.

41.     Unless otherwise approved by Wells Fargo, the Debtors' accounts receivable will not be included in the auction.   Rather, the proceeds thereof will continue to be applied to pay down the obligations owed to Wells Fargo as and when received.  After the obligations owed to Wells Fargo are satisfied, the proceeds of the Debtors' remaining accounts receivable, and the proceeds of all other collateral that secures the claims of Wells Fargo, Kid and Hanes, shall be distributed in accordance with the Waterfall.

42.     Other pertinent terms of the Settlement are:

(a)     The security interests of Kid in the Collateral shall be determined to be valid, duly perfected and unavoidable, junior only to Wells Fargo's liens and *pari passu* with Hanes' liens and Kid's claim shall be allowed in the amount of $19 million plus accrued and accruing interest and costs recoverable under the Kid loan documents as of the Petition Date, without offset, defense or counterclaim of any kind.  All payments to Kid or on account of Kid's claims, or other consideration received by Kid from the Estates shall be deemed payments made on account of the Kid Note.

(b)        Hanes' security interests in the Debtors' assets shall be determined to be valid, duly perfected and unavoidable, junior only to Wells Fargo's liens and *pari passu* with Kid's liens and Hanes' claim shall be allowed in the amount of $500,000 plus accrued and accruing interest and costs recoverable under the Hanes loan documents as of the Petition Date.

(c)        Kid and the Trustee agree to set off, cancel and extinguish, without payment of funds to or from either party, all amounts due and owing by Kid to any of the Debtors or their subsidiaries arising from all dealings between the Debtors or any of their subsidiaries prior to the Petition Date, including the Total Transitional Rent Credits payable to the Debtors' estates and the Canadian Sassy receivable payable to Russ Canada's estate against all amounts payable by the Debtors to Kid or to Holdco on the Kid Note; provided, however, such setoffs shall not give rise to any obligation to make any payment to Hanes.  Holdco may assert claims for unpaid royalties as general unsecured claims.

(d)        The Trustee and the Debtors' estates will release Kid and its professionals from any and all claims and causes of action, including without limitation under the avoidance provisions of the Bankruptcy Code and including any claims arising from the sale of the Gift Business, provided that such release shall not apply to Kid's obligations under this Settlement.

(e)        The Trustee and the Debtors' estates will waive and release Wells Fargo and its professionals from any and all claims that could be brought in connection with the Debtors' bankruptcy cases, including under the avoidance provisions of the Bankruptcy

Code, as well as arising in connection with the Credit Agreement and the prepetition loan documents.

(f)     The Trustee and the Debtors' estates will waive and release Hanes and his professionals from any and all claims that could be brought in connection with the Debtors' bankruptcy cases, including under the avoidance provision of the Bankruptcy Code, as well as claims arising in connection with the Hanes Note and related documents.

(g)     Kid, Hanes and Wells Fargo will waive and release all claims against each other and each other's professionals from any and all claims in connection with their respective loan transactions with the Debtors and agreements between or among them relating thereto or with respect to the Debtors or their subsidiaries, provided, however, such releases shall not affect the parties obligations under this Settlement or under the intercreditor agreements entered into among Kid, Hanes and Wells Fargo.

(h)     Except as provided herein or in the Final Financing Order (as modified by this Settlement), Kid, Hanes and Wells Fargo will waive and release all claims against the Estates other than the indebtedness due to each of them in accordance with this Settlement.

(i)     Kid, Hanes and Wells Fargo will release and waive any and all claims against Clear Thinking Group or against Stuart Kessler solely in his capacity as the Debtors' pre-petition Chief Restructuring Officer connection with the transactions among Kid, Hanes and Wells Fargo and the Debtors.

(j)     Clear Thinking Group and Stuart Kessler, solely in his capacity as the Debtors' pre-petition Chief Restructuring Officer, will release and waive all claims

14

against Kid, Hanes, Wells Fargo and their professionals in connection with the transactions among Kid and Wells Fargo and the Debtors.

(k)    The Trustee will cooperate, at Kid's expense, with Kid's efforts to resolve the claim asserted by the Cranbury landlord against Kid including by providing assistance by personnel currently being employed by the Trustee.

(l)    The Debtors' estates rights with respect to the Kid IP will terminate at the earlier of six months from the date of the entry of the Sale Order (as defined below) or the date of liquidation of all of the operations of Russ US (as defined below), Russ Canada, Russ UK and Russ Australia.

(m)    Kid will waive its claims to royalties for its IP rights as a result of the Trustee's liquidation of the Debtor Assets, the Russ UK Assets and the Russ Australian Assets except that it will be entitled to a 5% royalty on any inventory sold by a third party liquidator retained by the Trustee as part of the liquidation process.

(n)    The releases and waivers set forth herein shall not apply to the obligations of the Trustee, Hanes, Kid and Wells Fargo under this Settlement.

(o)    The parties will cooperate to structure the sale of the Debtor Assets in a manner that is most tax efficient to Kid, provided that such structure does not result in any adverse consequences to the Estates and that the consideration to the parties does not change.

(p)    The Trustee shall take such action reasonably requested by Kid, at Kid's expense, which is in accordance with all governing documents and controlling law, if any, to remove any person designated by the Debtors from the Board of Directors of

Holdco, and shall waive the right to designate any additional members of the Board of Directors of Holdco.

43.     The Trustee seeks approval of the Settlement pursuant to Rule 9019.

44.     Settlements and compromises under Rule 9019 are favored in bankruptcy cases to '"minimize litigation and expedite the administration of the bankruptcy estate.'" *In re Martin,* 91 F.3d 389, 393 (3rd Cir. 1996), *quoting 9 Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993).

45.     In considering a proposed settlement, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromised proposal." *Id.*

46.     To guide the Court in that assessment, the Third Circuit Court of Appeals adopted the following criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending to it; and (4) the paramount interest of the creditors." *Id., citing Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25, 88 S.Ct. 1157, 1163-64, 20 L.Ed.2d 1 (1968), and *In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 803 (E.D.Pa.1986).

47.     As another Court explains, "[t]he court is not supposed to have a 'mini-trial' on the merits, but should 'canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Jasmine Ltd.,* 258 B.R. 119, 124 (D.N.J.2000), *quoting In re Neshaminy Office Building Assoc.*, 62 B.R. 298, 803 (E.D.Pa.1986) and *citing In re Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D.Pa.1992), *aff'd,* 8 F.3d 812 (3d Cir. 1993).

48.     Likewise, the Court should 'defer to the trustee's judgment so long as there is a legitimate business justification." *In re Martin,* 91 F.3d at 395 (citations omitted).

49.     The Settlement falls within the criteria established by the Third Circuit for approving a settlement.  The Settlement provides a mechanism through which (a) Wells Fargo's claim will be satisfied, (b) the claims asserted by Kid and Hanes will be compromised and settled, and (c) a pool of funds will be established from which other creditors of the Debtors' estates may be paid.  Without approval of the Settlement, it is unlikely that any distribution would be available for other creditors.

50.     As explained above, Kid sold the Gift Business to the Debtors.  In certain of its filings with the United States Securities and Exchange Commissions, Kid disclosed potential causes of action that might be brought related to that transaction.  In addition, the Trustee received other operational and financial information related to that transaction that might give rise to additional causes of action.  After considering the potential claims, including discussions with Debtors' management and Kid, and considering the debt owed to Kid, the Trustee has determined that the Settlement is in the best interest of the Debtors' estates and their creditors.  However, the Trustee reserves all rights to pursue claims arising from the sale of the Gift Business against persons or entities that are not parties to the Settlement.

51.     In addition, if the Settlement were not approved, the potential litigation to be commenced against Kid is anticipated to be expensive and time consuming due to the complexity of the potential issues.  Further, the likelihood of the Trustee's success or ability to collect on a judgment is uncertain.

**H.**     **The Sale of the Debtors' Assets**

52.     The Debtors' assets that will be included in the sale consist of the property set

forth below (the "Debtor Assets").

53.    Specifically excluded from the definition of Debtor Assets and from the sale (the "Excluded Debtor Assets") are Tri Russ, Russ China, Russ Ireland, US Accounts Receivable (defined below), all cash, bank accounts, security deposits for Russ US, cash value of life insurance policies, Pre-Paid Expenses (defined below), all causes of action and claims against third parties belonging to the Debtors' estates, all rights under or related to any and all benefit plans and all books and records related to the Excluded Debtor Assets.

54.    The assets of Russ Companies, Russ Berrie Gift, Encore and Russplus (collectively, "Russ US") include the following:

(a)    The accounts receivable owned by Russ US (the "US Accounts Receivable") which are estimated to be $7,690,000 as of June 6, 2011.

(b)    Prepaid expenses (the "Pre-Paid Expenses"), including prepaid royalties and inventory

(c)    Security deposits (the "Security Deposits"), including deposits for leases of real property.

(d)    Inventory (the "US Inventory") which consists of more than 3000 active SKU's of plush toys and impulse giftware, including stuffed animals, mugs, picture frames, figurines, greeting cards and stationery, marketed for seasonal and holiday sales (e.g., Valentine's Day, Easter, Mother's Day, Christmas, and spring) as well as general giftware, baby and juvenile items, garden, animal and inspirational stock.  The US Inventory will be sold free and clear of liens pursuant to sections 363(b) and (f) of the Bankruptcy Code.

18

(e)     Inventory consisting of approximately 125 active SKU's in the general giftware, baby and juvenile items, garden, animal and inspirational categories (the "Russ US Shipped Inventory") located in 11 containers in ports in the United States.  The US Shipped Inventory will be sold subject to freight charges, custom duties, storage and taxes.

(f)     The option to purchase inventory (the "Russ US Option Inventory") which was ordered by Russ US for manufacture overseas but has not been paid for by Russ US, is not owed by Russ US and is located at the manufacturer's location.  The Russ US Option Inventory consists of several hundred SKU's in the Garden, Baby, General Giftware and Plush categories.  The Trustee is selling only his option to purchase the Russ US Option Inventory.  The Russ US Option Inventory is being sold subject to fees and costs owed to the manufacturer in connection with costs related to the manufacture and delivery of the Russ US Option Inventory.

(g)     Intellectual property consisting of a variety of intellectual property including trademarks, trade dress, designs and other related proprietary assets, licensing agreements and domain names (collectively, the "Russ IP").  Trade names include popular brands as Yomiko Classics®, Softies®, Li'l Peepers®, United Design®, Figi®, Living Stone® and JW Stannard®.

(h)     The Russ US customer list (the "US Customer List"), which contains information related to more than 24,000 customers in each of the fifty states and US territories.

(i)      The furniture, fixtures and equipment ("US FF&E") owned by Russ US consists of desks, chairs, laptop and desktop computers, handheld sales force automation devices and peripherals.

(j)      The machinery and equipment ("US M&E") owned by Russ US consists of electric pallet trucks, forklifts, cherry pickers, warehouse racking, handheld wireless warehouse devices and power conveyer.

(k)      The vehicles owned by Russ US (collectively, the "US Vehicles") consisting of a Chrysler Minivan and Ford Cargo Van.

(l)      Unexpired leases and executory contracts in which Russ US has an interest (the "Russ US Leases").

(m)      Russ Companies' ownership interest in Russ UK (the "Russ UK Stock").  The assets of Russ UK are set forth in paragraph 78 below.

(n)      Russ Companies' ownership interest in Russ Australia (the "Russ Australia Stock"). The assets of Russ Australia are set forth in paragraph 79 below.

(o)      Russ Companies' ownership interest in Russ Canada (the "Russ Canada Stock").  The assets of Russ Canada are set forth in paragraph 80 below.

55.      The Trustee seeks entry of an Order authorizing the sale of the Debtor Assets pursuant to sections 363(b), (f) and (m) of the Bankruptcy Code.

56.      The sale of the Assets shall be "AS IS, WHERE IS," with all faults, and without any representations or warranties (express or implied) of any kind or nature.

57.    In accordance with the Final Financing Order, Wells Fargo shall have the right, under section 363(k) of the Bankruptcy Code, to credit bid for each or all of the Debtor Assets up to the amount of all outstanding obligations owed.

58.    Section 363(b) of the Bankruptcy Code governs sales of assets outside the ordinary course of business and provides that "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

59.    The Third Circuit Court of Appeals has interpreted section 363(b) of the Bankruptcy Code to require a finding by the Bankruptcy Court that the purchaser of a debtor's assets is a good faith buyer. *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149-50 (3d Cir. 1986). The Bankruptcy Code does not define good faith. In *Abbotts Dairies,* the Third Circuit observed that courts have interpreted that phrase to mean one who purchases "in good faith" and for "value." *Abbotts Dairies,* 788 F.2d at 147 (citing *In re Bel Air Assocs.,* 706 F.2d 301, 305 (10th Cir. 1983); *In re Rock Indus Mach., Corp.,* 572 F.2d 1195, 1197 (7th Cir. 1978)).

60.    The *Abbotts Dairies* Court then analogized the *bona fides* of a Section 363(b) purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith...speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Abbotts Dairies,* 788 F.2d at 147 (*quoting In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir. 1978)).

61.    The Trustee submits that the proposed sale satisfies the "good faith" prong of the *Abbotts Dairies* test. The Trustee is selling the Assets in a public auction. The Assets have been marketed for more than six months to strategic parties, financial parties and liquidators. There is

no indication that any prospective bidder would be anything other than a good faith buyer.   In addition, in order to be qualified to submit a bid for any of the Debtor Assets or Non-Debtor Assets, a bidder must disclose any relationship it has with the Debtors, their insiders as defined under section 101(31) of the Bankruptcy Code, the Office of the United States Trustee and the Trustee and his professionals.

62.    Further, all of the terms of the proposed sale have been fully disclosed to the Court and prospective purchasers by the Trustee.   *See, In re Colony Hill Assoc.,* 111 F.3d 269 (2d Cir. 1997) (determination of "good faith" is based on traditional equitable principles, including whether there has been full disclosure to the Bankruptcy Court).

63.    The Trustee may sell the Debtor Assets free and clear of any interests or liens in such property pursuant to section 363(f) of the Bankruptcy Code if one of the following criteria is met:

(1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity would be compelled in a legal or equitable proceeding to accept the money satisfaction of such interest.

64.    Since section 363(f) of the Bankruptcy Code is in the written disjunctive, the Trustee need only satisfy one of the five alternatives presented. *In re Heine*, 141 B.R. 185, 189 (Bankr. D.S.D. 1992); *In re Elliot,* 94 B.R. 343, 345 (E.D. Pa. 1988).

65.     Wells Fargo, Kid and Hanes have consented to the sale of the Assets, thus satisfying section 363(f)(3) of the Bankruptcy Code.

66.     Before the Court can approve the sale of the Assets pursuant to section 363(f)(3) of the Bankruptcy Code, the Court must find that the interests of the alleged lien holders are adequately protected under section 363(e) of the Bankruptcy Code.[2]

67.     The legislative history accompanying section 363 of the Bankruptcy Code explains that the most common form of adequate protection is to have the secured creditor's lien attach to the proceeds of sale.  H.R. Rep. No. 595, 95th Cong., 1st Sess. 345 (1977), *reprinted in U.S. Code Cong. & Admin. News* 1978, p. 5787; *accord Heine*, 141 B.R. at 190; *Hatfield*, 30 B.R. at 355 n.6.

68.     The interests of Wells Fargo, Kid and Hanes will attach to the proceeds of the sale of the Debtor Assets and will be paid in accordance with the Settlement.  Thus, their claims are adequately protected.

69.     Section 363(m) of the Bankruptcy Code provides that a reversal or modification on appeal of an authorized sale of property under section 363(b) of the Bankruptcy Code will not affect the validity of such sale to a good faith purchaser.  The sale of the Debtor Assets will be the product of good faith negotiations between the Trustee and the Successful Bidder (as defined below).  Therefore, the Successful Bidder is entitled to the protection of section 363(m) of the Bankruptcy Code upon approval at the sale.

70.     Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, an order authorizing the sale of assets is stayed for fourteen (14) days after entry of the order unless the

---

[2] Section 363(e) provides:

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property to be used, sold, or leased, by the trustee [or debtors-in-possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

Court orders otherwise.  The Trustee requests that the Court waive the fourteen (14) day period set forth in Rule 6004(h).

**I.**     **Sale or Closure of Non-Debtor Subsidiaries**

71.    As previously noted, Russ Canada is currently being liquidated through a receivership proceeding.  Pursuant to an agreement between the Trustee and the Receiver, the Trustee will offer the Russ Canada Assets for sale.  The Receiver shall have the absolute right to reject or accept any and all offers for the Russ Canada Assets.

72.    In the event that the Trustee cannot sell the Debtors as global going concerns, or is unable to sell the ownership interests in Russ UK and Russ Australia, and in order to efficiently wind-up the operations of the other non-debtor foreign subsidiaries, the Trustee seeks authority from this Court to terminate the boards of the directors of certain of the Debtors' foreign subsidiaries and to replace those directors with directors of the Trustee's choosing, including appointing himself as a director.

73.    In order to facilitate the orderly liquidations of Tri Russ and Russ China, the Trustee, on behalf of the Russ Companies, seeks authority to terminate the directors of Tri Russ and Russ China.  Upon such terminations, the Trustee will cause Russ Companies to appoint the appropriate number of new directors, chosen at the sole discretion of the Trustee, to replace the terminated directors.  The Trustee will then, on behalf of the Russ Companies, cause the new boards of directors to authorize the continued pursuit of insolvency proceedings for Tri Russ and Russ China.  It is estimated that the costs associated with the liquidation of Tri Russ and China, and any costs associated with the Debtors' operations in Korea, including professional fees and expenses, could total $175,000.  The Trustee seeks authorization to pay such expenses without further order of this Court.

74.     The Trustee, on behalf of Russ Companies, likewise seeks authority to terminate the directors of Russ UK and Russ Australia and appoint the requisite number of new directors, chosen at the sole discretion of the Trustee, to replace the terminated directors.  The Trustee will then, on behalf of Russ Companies, cause the new boards of directors to authorize the liquidation of the assets of Russ UK, Russ Australia and Russ Spain consistent with the proposed Sale Process set forth in this Motion.

75.     The Trustee believes that such relief is necessary to accomplish the goals of satisfying the obligations of Wells Fargo, Kid and Hanes and maximizing a distribution to the Debtors' creditors.

76.     In the event that the authority is not granted, the Trustee would have no ability to control and coordinate the sale or liquidation efforts of the Debtors' foreign subsidiaries.

77.     If the Trustee is granted such authority to terminate the boards of directors of Russ UK and Russ Australia, and along with the authority given to him by the Receiver, the Trustee will solicit offers for the assets (the "Non-Debtor Assets") of Russ UK, Russ Australia and Russ Canada (the "Non-Debtor Entities") in accordance with the Sale Process and Bid Procedures as hereafter defined.

78.     The assets of Russ UK (the "Russ UK Assets") consist of the following:

(a)     Russ UK's ownership interest in Russ Spain.

(b)     The Russ UK accounts receivable (the "UK Accounts Receivable") are estimated at $3,664,000 as of March 21, 2011.

(c)     The Russ UK inventory (the "UK Inventory") consists of more than 3000 active SKU's of plush toys and impulse giftware, including stuffed animals, mugs, picture frames, figurines, greeting cards and stationery, marketed for seasonal and holiday sales

(e.g., Valentine's Day, Easter, Mother's Day, Christmas, and spring) as well as general giftware, baby and juvenile items, garden, animal and inspirational stock.

(d)  Russ UK has the exclusive right to use the Russ IP throughout Europe (the "UK IP").

(e)  The Russ UK customer list (the "UK Customer List") contains information related to more than 4400 customers located in primarily in Europe and the Middle East.

(f)  The furniture, fixtures and equipment owned by Russ UK consists of desks, computers and communication equipment (the "UK FF&E").

(g)  The machinery and equipment owned by Russ UK consists of electric pallet trucks, forklifts, cherry pickers, warehouse racking, handheld wireless devices and power conveyor ("UK M&E").

(h)  Unexpired lease for the premises located at Stoke Park, Tower Lane, Eastleigh, Hampshire, UK, SO50 6NZ

79.  The assets of Russ Australia (the "Russ Australia Assets") consist of the following:

(a)  The Russ Australia accounts receivable (The "Australia Accounts Receivable") are estimated at $2,231,000 as of March 31, 2011.

(b)  The Russ Australia inventory (the "Australia Inventory") consists of more 3000 active SKU's of plush toys and impulse giftware, including stuffed animals, mugs, picture frames, figurines, greeting cards and stationery, marketed for seasonal and holiday sales (e.g., Valentine's Day, Easter, Mother's Day, Christmas, and spring) as well as general giftware, baby and juvenile items, garden, animal and inspirational stock.

(c)     Russ Australia has the exclusive right to use the Russ IP throughout Australia and Asia Pacific (the "Australia IP").

(d)     The Russ Australia customer list (the "Australia Customer List") contains information related to more than 3,200 customers located in Australia, New Zealand and the Pacific Rim.

(e)     The furniture, fixtures and equipment owned by Russ Australia consists of desks, computers and communication equipment (the "Australia FF&E").

(f)     The machinery and equipment owned by Russ Australia consists of material handling equipment ("Australia M&E").

(g)     Unexpired leases for the premises located at Portside Distribution Centre, Unit 1, Building A, 2-8 McPherson St., Banksmeadow, NSW,Australia 2019.

80.     The assets of Russ Canada (the "Russ Canada Assets") consist of the following:

(a)     The Russ Canada accounts receivable (The "Canada Accounts Receivable") are estimated at $1,279,783 CD as of June 7, 2011.

(b)     The Russ Canada inventory (the "Canada Inventory") consists of approximately 4000 active SKU's of plush toys and impulse giftware, including stuffed animals, mugs, picture frames, figurines, greeting cards and stationery, marketed for seasonal and holiday sales (e.g., Valentine's Day, Easter, Mother's Day, Christmas, and spring) as well as general giftware, baby and juvenile items, garden, animal and inspirational stock.

(c)     Russ Canada has the exclusive right to use the Russ IP throughout Canada (the "Canada IP").

(d)     The Russ Canada customer list (the "Canada Customer List") contains information related to more than 3323 customers located throughout Canada.

(e)     The furniture, fixtures and equipment owned by Russ Canada consists of desks, chairs and laptop computers (the "Canada FF&E").

(f)     The machinery and equipment owned by Russ Australia consists of electric pallet trucks, forklifts, cherry pickers and warehouse racking ("Canada M&E").

(g)     Unexpired lease for the premises located at 18 Parkshore Drive, Brampton, Ontario.

81.     Specifically excluded from the definition of Non-Debtor Assets and the sale (the "Non-Debtor Excluded Assets") are all cash and bank accounts of Russ UK, Russ Australia and Russ Canada.

82.     The proceeds from the sales of the assets of Russ UK Assets and Russ Australia Assets will be used to wind down the operations of Russ UK and Russ Australia respectively, and to pay the obligations owed by Russ UK and Russ Australia respectively.  Any sale proceeds remaining after payment of Russ UK and Russ Australia wind down costs and obligations will be paid over and delivered to Trustee and distributed in accordance with the Waterfall or as otherwise provided.

83.     The Trustee reserves the right to cause the Non Debtor Entities (exclusive of Russ Canada) to liquidate or otherwise dispose of any assets owned by such Non Debtor Entity which may have inadvertently been omitted from the definitions of the assets of such Non Debtor Entity.

84.     The sale of the Non-Debtor Assets shall be governed by the laws of the respective countries in which Non-Debtor Entities are situated and <u>not</u> by sections 363 or 365 of the Bankruptcy Code or any related Rules.

85.     The Trustee proposes to advertise the proposed sale of the Non-Debtor Assets in publications located in the respective Non-Debtor Entities' locale.  The Trustee believes that such notice will apprise interested parties in each location of the availability of all, or a portion, of the Non-Debtor Assets for sale.  It will also apprise any parties who assert an interest in the Non-Debtor Assets of the pending sales and an opportunity to object to such sale.

**J.**      **<u>Approval of the Bidding Procedures</u>**

86.     The Trustee respectfully proposes and seeks approval of the bidding procedures (the "Bidding Procedures") set forth below in connection with the contemplated sale of the Assets.  Offers to purchase the Assets may be accepted by the Trustee only if they meet the Bidding Procedures, which shall govern the qualification of bidders, the submissions, content and qualification of all bids concerning the Assets:

> **a.**      **<u>Qualified Participant</u>**:  In order to be qualified to participate in the Auction sale of the Assets (the "Auction"), a potential bidder must:
>
>> i.      execute a non-disclosure agreement in form and subject acceptable to the Trustee;
>>
>> ii.     acknowledge that the due diligence information provided by the Trustee has been prepared solely for the convenience of potential bidders to assist them in their determination of whether they wish to submit a proposal to purchase all or certain of the Assets;

iii.    acknowledge that the Trustee makes no representation or warranty that such due diligence information is complete or accurate and any and all representations or warranties, express or implied, are hereby expressly disclaimed; and

iv.    acknowledge that the potential bidder will not and should not reasonably rely on this information in arriving at a decision to purchase part or all of the Assets.

**b.**    **Qualified Bidders**:  Only qualified bidders (the "Qualified Bidders") may submit bids for the Assets, or otherwise participate in the Auction.  Persons or entities who propose to become Qualified Bidders ("Proposed Qualified Bidders") shall:

i.    comply with all of the requirements of paragraph 86(a) above provided, however, Wells Fargo shall be deemed to be a Qualified Bidder without the necessity for the submission of a Qualified Bid (as defined below) and shall be permitted to credit bid pursuant to section 363(k) of the Bankruptcy Code; and

ii.    on or before 5:00 p.m. (EST) on June 27, 2011 (the "Bid Deadline"), submit an offer that complies with each of the following requirements (a "Qualified Bid") to the Trustee, c/o Kim R. Lynch, Esq., Forman Holt Eliades & Ravin LLC, 80 Route 4 East, Suite 290, Paramus, New Jersey, via facsimile at (201) 845-9112 or via email at russ@formanlaw.com;

**c.**    **Qualified Bid:**  Each Qualified Bid must:

i.    identify each or all of the Assets to be purchased and the purchase price offered for each or all of the Assets;

ii.      be subject to no conditions, contingencies, due diligence or board approval unless otherwise agreed to by the Trustee;

iii.      disclose the (a) identity of each person or entity that will be bidding for each or all of the Assets identified (including any equity holder or financial backer if a Qualified Bidder has been formed solely for the purpose of purchasing each or all of the Assets) and (b) relationship or connection, if any, to (1) the Debtors, (2) any insider of the Debtors as defined under section 101(31) of the Bankruptcy Code, (3) the Office of the  United States Trustee, or (4) the Trustee and his professionals.

iv.      be for cash (or cash equivalent), payable in full at the closing, and not subject to any financing contingencies;

v.      be accompanied by evidence, as determined by the Trustee after consultation with Wells Fargo, that the proposed Qualified Bidder has sufficient financial wherewithal and ability to close and consummate the proposed purchase of the Assets;

vi.      remain open and irrevocable until the consummation of a sale to the Successful Bidder (as defined below);

vii.      must commit to pay the Cure Amounts for all Assumed Executory Contracts, Unexpired Leases or Licenses in full, in cash, at Closing (all as defined below);

viii.      be accompanied by a certified check, bank check or cashier's check in the amount of ten percent (10%) of the amount of the Qualified Bid (the

"Deposit"), made payable to "Charles M. Forman, Chapter 7 Trustee for Russ Berrie US Gift, Inc. et al.";

ix.      if made by an entity, be accompanied by evidence that the Qualified Bidder is duly authorized by its entity to (a) submit the bid and (b) consummate the purchase of each or all of the Assets;

x.      **not** include a request or demand for a break-up fee or expense reimbursement; and

xi.      state that if party making the Qualified Bid is the Successful Bidder for the any or all of the Assets and fails to consummate the sale and close title, then the Trustee shall be entitled to retain the Deposit as liquidated damages.

**d.     Bid Notification.**  The Trustee will notify all Qualified Bidders by June 28, 2011 of his determination, after consultation with Wells Fargo, of the Qualified Bids, and identity of the Qualified Bidders, submitting the highest or best bid for each or all of the Assets.

**e.     Auction Sale**.  If one or more Qualified Bids is received, the Trustee will conduct the Auction at the Debtors' offices located at 1800 Valley Road, Wayne, New Jersey on June 29, 2011 commencing at 10:00 a.m. (EST).  Bidding for the Assets will commence with the highest Qualified Bid(s) for each or all of the Assets determined in accordance with the foregoing paragraph.  Bidding will then be permitted at such increments as the Trustee deems appropriate, in his sole discretion, until all Qualified Bidders have made their final offers and until such time as the highest or best offer(s) is determined by the Trustee.  The Trustee may adopt rules for the bidding process that, in his judgment, will better promote the goals of the bidding process.

**f.**    <u>**Winning Bid(s)**</u>:    At the conclusion of the Auction, the Trustee will announce his determination of the highest and best bid for each or all of the Assets (each, a "Successful Bid") obtained from the Qualified Bidder(s) (each a "Successful Bidder") and the second highest and best bid for each or all of the Assets (the "Back Up Bid") obtained from the Qualified Bidder(s) (each a "Back Up Bidder").  Formal acceptance of the Successful Bid and Back Up Bid shall not occur unless and until the Court enters an Order or approving the Successful Bid and Back Up Bid and authorizing the Trustee to consummate the sale following the conclusion of the hearing to approve each or all of the assets to the Successful Bidder(s) (the "Sale Hearing").

**g.**    <u>**Back Up Bid**</u>:  In the event the Successful Bidder fails to close title to the Assets by the Closing Deadline (defined below) for any reason other than the Trustee or Debtor's default, each Back Up Bidder, as the case may be, shall become the Successful Bidder and the Trustee may close the sale of the Assets to Back Up Bidders without further Order of this Court.

**h.**    <u>**The Deposit**</u>:    If a Qualified Bidder becomes a Successful Bidder (as defined below), the Deposit shall be applied towards the amount of the Successful Bid. In the event that a Qualified Bidder is not the Successful Bidder, the Trustee will return the Deposit to such Qualified Bidder within ten (10) business days of the Auction.

**i.**    <u>**The Asset Purchase Agreement**</u>.    The Trustee reserves the right to prescribe the form of Asset Purchase Agreement to be entered into between the Trustee and the Successful Purchaser(s).

**j.**    <u>**The Sale Hearing**</u>:  The Court will conduct the Sale Hearing on June 30, 2011 at 10:00 a.m. (EST) to approve the sale of each or all of the Debtor Assets to the

Successful Bidder(s).  The Trustee reserves the right to request that the Sale Hearing be adjourned on notice to Wells Fargo, Kid, Hanes, the Receiver and the Successful Bidders. At the Sale Hearing, the Trustee will seek, among other relief, an Order (each a "Sale Order") (A) authorizing him to sell the Debtor Assets to the Successful Bidder(s) under sections 363(b) and (f) of the Bankruptcy Code and granting to the Successful Bidder(s) the protections set forth in 363(m) of the Bankruptcy Code; and (B) authorizing him to assume and assign certain of the Unexpired Leases and Executory Contracts pursuant to sections 365(a), (f) and (k) of the Bankruptcy Code or alternatively, reject certain of the Unexpired Leases and Executory Contracts.  The Trustee shall issue appropriate bills of sales and assignments with respect to the sale of the Debtor Assets.  Bills of sale for the (i) Russ Canada Assets shall be executed by the Receiver; (ii) Russ UK Assets shall be executed by the designated officer of Russ UK, and (iii) Russ Australia Assets shall be executed by the designated officer of Russ Australia.

   **k.** **The Closing**:  The Successful Bidder shall consummate the purchase of each or all of the Assets within seven (7) days from the Court's entry of a Sale Order. The Closing for the sale of the Debtor Assets shall take place at the offices of Forman Holt Eliades & Ravin LLC, 80 Route 4 East, Suite 290, Paramus, New Jersey.

   **l.** **Contact Information:** Any person requesting information concerning any or all of the Assets should contact the Debtors' representatives, c/o The Russ Companies, Inc., 1600 Valley Road, Wayne, New Jersey, Attn:  Eric Lohwasser at 201-405-7311, email ELohwasser@russberrie.com or Amir Zfira at 561-212-3092, email azfira@clearthinkinggrp.com, or Trustee's counsel, Harry M. Gutfleish, Esq., or Kim R. Lynch, Esq., Forman Holt Eliades & Ravin LLC, 80 Route 4 East, Suite 290, Paramus,

New Jersey 07652, telephone (201) 845-1000, facsimile (201) 845-9112 or by email at

russ@formanlaw.com.

87.     The United States Bankruptcy Court for the District of New Jersey shall retain

jurisdiction over any matter or dispute arising from or relating to the implementation of the

Bidding Procedures.

**K.     Approval of the Sale Process**

88.     The Trustee will offer the Assets for sale in the order and manner set forth below

(the "Sale Process").

89.     The Trustee will solicit offers for the Assets as going concerns and as individual

lots in order to obtain the highest and best offer for the Assets.  Thus, prospective bidders will

have the ability to make an offer for some, or all, of the Assets.

90.     The Trustee will examine each of the offers, either individually or in conjunction

with other offers, and, after consultation with Wells Fargo determine the highest or best price for

the Debtor Assets, the Russ UK Assets and the Russ Australia Assets.  The Receiver shall have

the absolute right to determine the highest and best price for the Russ Canada Assets.

91.     Except for the Russ Canada Assets, the Trustee will accept such bid or bids, that

he believes, in his sole discretion and based on his business judgment, to be the highest and best

offers for the Asset.  The Trustee may reject any offer that he deems, after consultation with

Wells Fargo, inadequate.  The acceptance of any bids for the Russ Canada Assets will be subject

to approval by the Receiver, who may reject any offer that he deems in his sole and absolute

discretion, inadequate.

92.     Operational Assets:  The Trustee will offer for sale the Debtors' operational assets

as a going concern, which shall include the Debtors' equity interests in Russ US, Russ UK and

Russ Australia, not including the Excluded Debtor Assets and Non-Debtor Excluded Assets (the "Global Operational Assets").

(a)     A party making a bid for the Global Operational Assets may include an offer to purchase the right to use the intellectual property of Kid (the "Kid IP") (the "Enhanced Global Operational Assets"), which consists of the trade names "RUSS", "Russ Berrie" and "APPLAUSE", provided that Kid receives not less than $6,000,000, or such lesser amount as Kid in its sole and non-reviewable discretion may determine to accept, from the sale.

(b)     A party making an offer for the Global Operational Assets may include a request to purchase the US Accounts Receivable and Pre-Paid Deposits.

(c)     A party making an offer for the Global Operational Assets may include a request to purchase the Debtors' interest in Russ Canada.

(d)     The upset price for the Enhanced Global Operational Assets, exclusive of the US Accounts Receivable and Pre-Petition Deposits, is $20,000,000, subject to adjustment based on the amounts due to Wells Fargo at the time of the sale.

(e)     The Successful Bidder of the Global Operational Assets may, in its sole discretion, choose to not acquire all of the assets of the Debtors or Non-Debtor Entities. Bidders who choose to reject a portion of the assets of the Debtors or Non-Debtor Entities (the "Excluded Debtor Operational Assets" and "Excluded Non-Debtor Operational Assets, respectively, or collectively, the "Excluded Operational Assets") shall disclose their intention in this regard as part of their bid.  In such event, the Trustee may include the Excluded Operational Assets in the Auction.

93.    <u>Stock Sale</u>.    The Trustee will offer for sale the stock in Russ US, Russ UK, Russ Australia and Russ Canada (collectively, the "Stock Interests"), not including the Excluded Debtor Assets and Excluded Non-Debtor Assets.    Interested parties may make an offer for one, or a combination, of the stock interests of the Debtors.

(a)    The Successful Bidder of the Russ US Stock shall obtain the rights to the Russ IP.

(b)    The Successful Bidder of the Russ UK Stock, Russ Australia Stock and Russ Canada Stock shall obtain such rights to the Russ IP as existed on the Petition Date.

(c)    Parties making an offer for the Russ UK Stock, Russ Australia Stock or Russ Canada Stock may include in their offer a request to the rights to use the Kid IP on a non-exclusive basis limited to the UK, Australia or Canada, respectively, for a maximum of two (2) years and a five (5%) percent royalty fee.

(d)    Parties making an offer for the Russ UK Stock, Russ Australia Stock or Russ Canada Stock are advised that the Debtors provide VAX computer systems and support for inventory and sales.    The Successful Bidder may only have the ability to continue to use the VAX computer system and support for a period of two weeks following the Sale to arrange for its own industrial software program.

94.    <u>The Non-Operation/Stock Assets</u>.    The non-operational/stock assets consist of the individual categories of assets owned by Russ US, Russ UK, Russ Australia and Russ Canada set forth under paragraphs 54, 78, 79 and 80 respectively.    All of the assets owed by Russ US, Russ UK, Russ Australia and Russ Canada shall be offered for sale in individual lots.    Interested

parties may make an offer for one, or a combination, of the assets owned by Russ US, Russ UK, Russ Australia and Russ Canada.

95.     The Trustee and the Non-Debtor Entities may afford to the Successful Bidder of any of the US Inventory, UK Inventory and Australia Inventory a period of up to two weeks to arrange for the removal of the respective inventory, with such additional terms subject to negotiation by and among the Trustee, the Non Debtor Entities, the Receiver and the Successful Bidder.

## L.     The Marketing Efforts

96.     Prior to the Petition Date, the Debtors actively marketed their businesses as going concerns.

97.     Clear Thinking Group, in conjunction with the Debtors and the Debtors' investment banker, solicited offers from approximately 44 strategic and financial companies, who expressed an interest in the Debtors as going concerns.

98.     Subsequent to the Petition Date, the Debtors' employees and Clear Thinking Group, who was retained by the Trustee as his financial advisors, have continued the pre-petition marketing efforts, but have supplemented those efforts by including additional entities that might be interested in any category or categories of the Debtor Assets and the Non Debtor Assets.

99.     In total, the Trustee and Clear Thinking Group have contacted over 80 parties. To date, 50 parties have shown an interest in purchasing the Debtors' assets and 40 parties have signed Non-Disclosure Agreements.

100.   The Debtors maintain an on-line site (the "Data Room") which contains all requisite due-diligence materials for those parties having signed a Non-Disclosure Agreement. The Data Room is supplemented and updated as appropriate.

101.    In addition, the Trustee anticipates advertising the proposed sale(s) in the International Edition of the New York Times, the Financial Times (United Kingdom) and the Australian Financial Review.

**M.    Extension of Time to Assume Unexpired Leases, Executory and Licenses**

102.    Prior to the Petition Date, the Debtors were parties to various leases for non-residential real property, machinery and equipment (the "Unexpired Leases") and executory contracts for services and licenses (collectively, the "Executory Contracts").   Trustee seeks entry of an Order pursuant to section 365(d)(1) of the Bankruptcy Code extending the time by which the Trustee may assume or reject the Unexpired Leases and Executory Contracts.  A copy of the Unexpired Leases and Unexpired Contracts for which the Trustee seeks an extension of time to assume or reject are attached at **Exhibit A**.

103.    Under section 365(d)(1) of the Bankruptcy Code, the Trustee must assume or reject the Unexpired Leases or Executory Contracts within 60 days of the Petition Date, unless the Court for cause, grants additional time prior to the expiration of such 60-day period.  The last date to assume the Unexpired Leases or Executory Contracts is June 20, 2011.

104.    The Trustee submits that sufficient cause exists for the Court to grant to the Trustee an extension of time to assume or reject the Unexpired Leases and Executory Contracts an additional sixty (60) days, through and including August 19, 2011, without prejudice to the Trustee's right to seek further extensions for cause shown.

105.    The following five factors often are used to determine whether cause exists to extend the time to make a decision to assume or reject a lease under section 365(d)(4) of the Bankruptcy Code:

(a)  whether the leases are the primary assets of the debtor;

(b) whether the rejection of the leases would result in a windfall to the lessor for improvements made by the debtor-tenant;

(c) whether the debtor has had sufficient time to assess intelligently its financial situation and the potential value of its assets;

(d) whether the debtor continues to make rental payments to the landlords under the leases; and

(e) whether the lessor would be damaged beyond compensation available under the Bankruptcy Code.

*See In re Wedtech Corp.*, 72 B.R. 464, 471-72 (Bankr. S.D.N.Y. 1987) (citing *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105-06 (2d Cir. 1982).

106.    The Trustee is in the process of marketing the Debtor Assets, including the Debtors' interest in the Unexpired Leases and the Executory Contracts.

107.    The Trustee believes it would be premature to either assume or reject the Leases or Executory Contracts without first having given potential bidders the right to make an offer to assume the Leases and Executory Contracts.  Rejection of the Unexpired Leases and Executory Contracts at this juncture may cause significant harm to the Debtors' estates and their creditors, as the Unexpired Leases and Executory Contracts may have value to prospective bidders. Conversely, assumption of Unexpired Leases or Executory Contracts prior to a determination as to their value, if any, to the Estates via the Sale Process would create an unnecessary administrative expense to the Estates.

108.    Accordingly, the Trustee respectfully requests entry of an Order extending the time to assume or reject the Unexpired Leases and Executory Contracts through and including August 19, 2011.

**N.**     **Authority to Assume and Assign Leases and Executory Contracts**

109.     The Trustee further seeks authority to assume and assign some, or all, of the

Unexpired Leases and Executory Contracts set forth on **Exhibit A**.   In the event the Trustee is

not authorized to assume and assign any of the Unexpired Leases and Executory Contracts in the

Sale Order, such Unexpired Leases and Executory Contracts shall be deemed to be rejected by

the Trustee.

110.     In order for the Trustee to assume and assign the Unexpired Leases and Executory

Contracts, the Trustee must meet the requirements set forth in section 365 of the Bankruptcy

Code.  Sections 365(b)(1) and (f)(2) of the Bankruptcy Code authorize the Trustee to assume and

assign executory contracts and unexpired leases, and provide that:

> (b)(1) If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or lease
> unless, at the time of assumption of such contract or lease, the trustee:
>
>> (A) cures, or provides adequate assurance that the trustee will
>> promptly cure such default;
>>
>> (B) compensates or provides adequate assurance that the
>> trustee will promptly compensate, a party other than the
>> debtor to such contract or lease, for any actual pecuniary loss
>> to such party resulting from such default; and
>>
>> (C) provides adequate assurance of future performance under
>> such contract or lease. . . .
>
> (f)(2) The trustee may assign an executory contract or unexpired lease of the
> debtor only if –
>
>> (A) the trustee assumes such contract or lease in accordance with the
>> provisions of this section; and
>>
>> (B) adequate assurance of future performance by the assignee of such
>> contract or lease is provided, whether

111.    The "phrase 'adequate assurance of future performance,' … is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).  The assurance required "will fall considerably short of an absolute guaranty of performance." *Id.*  There is no single solution that will satisfy every case. Et al. Some possibilities can include sufficient financial backing, escrow deposits or other similar forms of security or guaranty, or even promises. *In re Gold Standard at Penn, Inc.*, 75 B.R. 669, 674 (Bankr. E.D. Pa. 1987) *citing In re Luce Industries, Inc.,* 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980), *rev'd on other grounds,* 14 B.R. 529 (S.D.N.Y. 1981); *see also In re Bygaph, Inc.*, 56 B.R. 596, 605-606 (factors in determining whether adequate assurance of future performance is present include the prospective assignee's financial resources and willingness to devote funding. However, the chief determinant of adequate assurance of future performance is whether the rent will be paid.).

112.    Potential bidders wishing to acquire the Unexpired Leases and Executory Contracts shall provide to the lessors and contract vendors such adequate assurance of future performance as may reasonably be required in order to assume such Leases and Executory Contracts.

113.    Contained within **Exhibit A** are the amounts required to cure the Unexpired Leases and Executory Contracts (the "Cure Amount") in connection with the assumption and assignment of the Unexpired Leases and Executory Contracts.  Unless a party to a Lease or Executory Contract objects to the Cure Amount on or before the date fixed for the Sale Hearing, the Cure Amounts set forth on **Exhibit A** shall be fixed as the Cure Amount for each respective Unexpired Lease and Executory Contract and any and all objections to the Cure Amount shall be deemed waived.

114.     Alternatively, if no offer is made for any of the Unexpired Leases or Executory Contracts, the Trustee will reject such Unexpired Lease or Executory Contract on the return date of the Sale Hearing.

115.     Pursuant to Rule 6006(d) of the Federal Rules of Bankruptcy Procedure, an order authorizing the assumption of an unexpired lease is stayed for fourteen (14) days after entry of the order unless the Court orders otherwise.  The Debtor requests that the Court waive the fourteen (14) day period set forth in Rules 6006(d).

## O.     <u>Authority to Reject Unexpired Leases and Executory Contracts</u>

116.     The Trustee further seeks entry of an order pursuant to section 365 of the Bankruptcy Code to reject the Unexpired Leases and Executory Contracts set forth on **Exhibit B**.

117.     The traditional test in determining whether to reject an unexpired lease or executory contract is the "business judgment" test. *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1195, 79 L.Ed.2d 482 (1984).  The business judgment test "requires only that the trustee demonstrate that rejection of the executory contract will benefit the estate." *In re Wheeling-Pittsburgh Steel Corp.,* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987), *citing In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr.S.D.N.Y.1984).

118.     The Trustee has determined that rejecting the Unexpired Leases and Executory Contracts set forth on **Exhibit B** is in the best interest of and beneficial to the Estates.  None of the Unexpired Leases or Executory Contracts set forth on Exhibit "B" are being sold, assumed or assigned by the Trustee.  The premises related to the Unexpired Leases for non-residential real property have all been vacated and accordingly, provide no benefit to the Estates.  Similarly, the Unexpired Leases of personal property and Executory Contracts set forth on **Exhibit B** provide no benefit to the Estates.

119.    Accordingly, this Court should authorize the Trustee to reject the Unexpired Leases and Executory Contracts set forth on **Exhibit B** as the Trustee has shown sound business judgment for such rejection.

120.    Nothing herein shall be deemed to be an abandonment, waiver or relinquishment of the Trustee's or the Debtors' interest in, and the Trustee specifically reserves all rights and retains the Debtors' interest in and to, the security deposits paid by the Debtors to the following landlords at the following locations:   (a)  Encore Partners LLC for the premises located at 11413 West Bernardo Court, San Diego, California and (b) World Market Center LV, 495 S. Grand Central Parkway, Suite C-888, Las Vegas, Nevada.

**P.    <u>Authority to Abandon Assets</u>**

121.    The Trustee seeks entry of an order pursuant to section 554 of the Bankruptcy Code authorizing him to abandon the furniture, fixtures and equipment and inventory, if any, located at the Debtors' former offices and showrooms set forth on **Exhibit C**.

122.    Section 554 of the Bankruptcy Code authorizes the Trustee to abandon property of the Debtors that he determines to be burdensome to or of inconsequential value or benefit to the Estates.

123.    Property of any value located at the Debtors' former premises has been transferred to the Debtors' locations in New Jersey.  The property to be abandoned consists of sample inventory, fixtures, furnishings and equipment having *de minimis* value.

124.    The Trustee believes that the costs associated with packing and transporting the property to be abandoned to the Debtors' locations in New Jersey is greater than the value of the property that would be realized upon their liquidation.

**Q.**　　**No Prior Applications for Relief Sought**

125.　　No prior application has been made to this or any other Court for the relief sought

herein.

**R.**　　**Notice**

126.　　Notice of this motion shall be given in accordance with the Order Shortening

Time Submitted herewith.

**S.**　　**Conclusion**

WHEREFORE, the Trustee respectfully requests that the Court enter the relief sought

herein and grant to the Trustee such other and further relief that the Court deems just and proper.

FORMAN HOLT ELIADES & RAVIN LLC
Attorneys for Charles M. Forman,
Chapter 7 Trustee


By:*/s/Harry M. Gutfleish*　　　　　　　　　
　　Harry M. Gutfleish
　　Kim R. Lynch

Dated:  June 10, 2011

m:\cmf\the russ companies\sale\hg draft\russ sale application (hg 6-10-11).doc